UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MICHAEL P. SWYGART,

       Petitioner,

         v.                        CAUSE NO. 1:22-CV-240-HAB-SLC

WARDEN,

       Respondent.

OPINION AND ORDER

Michael P. Swygart, a prisoner without a lawyer, filed a habeas corpus petition to challenge his convictions for child molestation and sexual misconduct with a minor under Case No. 01C01-1512-F4-9. Following a jury trial, on March 20, 2017, the Adams Circuit Court sentenced him to twenty-six years of incarceration but, on post-conviction review, his sentence was reduced to twenty-one years of incarceration.

FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> When I.H. was born, she suffered from several developmental issues. Swygart was I.H.'s step-father and her primary caregiver. I.H. was never close to, and did not get along with, her mother, so she spent most of her time with Swygart. At all times relevant to this appeal, I.H. lived in a home in Adams County with Swygart, her mother, and her step-brother, M.M.

As a child, I.H. suffered from anxiety which left her scared to be alone, specifically in the shower. Because I.H. feared being alone, Swygart would typically stand in the bathroom while she showered and would leave the bathroom when she finished so that she could get dressed. However, one day when I.H. was thirteen, Swygart failed to leave the bathroom after she had finished in the shower. Swygart told I.H. that he needed to "check something first." When I.H. inquired into what he needed to check, Swygart indicated that he needed to see if she was a virgin. While still in the private confines of the bathroom, Swygart forcibly placed I.H on top of the washing machine. I.H., who was still naked from her shower, kicked at Swygart and told him to stop. Despite I.H.'s request that he stop, Swygart forcibly grabbed I.H.'s "thighs to pull her legs apart," placed his head between I.H.'s legs, and spread her vagina apart with both of his hands. He stared at I.H.'s vagina for several seconds before remarking "okay, you are." Swygart then left the bathroom. I.H. reported the incident to her mother "right after it happened." I.H.'s mother confronted Swygart who "threw a fit." I.H.'s mother then yelled and cussed at I.H. and forced her to apologize to Swygart.

One morning during the summer of 2015, after I.H. had turned fourteen, I.H. and Swygart were alone in the family home from approximately 3:30 a.m. until approximately 6:00 a.m. I.H., who was in her bedroom watching cartoons, had taken one of her mother's "Klonopins" to help her fall asleep. At some point, Swygart entered I.H.'s bedroom wearing "just his boxers." After I.H. indicated that she was having trouble falling asleep, Swygart suggested that she "take another Klonopin." After a couple of minutes, while I.H. was lying flat on her bed, Swygart "looked at I.H. and said let me show you something." He then started rubbing the outside of I.H.'s vagina. Swygart "then moved inside [I.H.'s] pants and started fingering her." I.H. subsequently indicated that it hurt when Swygart did so.

Swygart then removed I.H.'s pajama pants and underwear and "started licking her vagina." Swygart had positioned his body so that he was "laying down on the bed" with his body in the "opposite direction" from I.H.'s body. Swygart continued licking I.H.'s vagina for "a couple minutes." I.H. subsequently indicated that it also hurt when Swygart committed this act.

Swygart then "got on [I.H.'s] bed on his knees and inserted his penis a little bit." I.H. felt Swygart's penis "go inside" her. She later described that it seemed that Swygart "put a little bit of his penis in before he realized what he was doing" and that Swygart's penis was "inside of her" for

"maybe a couple seconds." I.H. later indicated that it hurt when Swygart committed this act.

Throughout the encounter, Swygart "kept asking [I.H.] if she liked it" and I.H. kept asking him to stop. After removing his penis from inside I.H., Swygart "got up, dressed [I.H.], and grabbed his phone and left [I.H.'s] room." After Swygart left, I.H. "curled up in a ball and just started crying." At some point, Swygart came back into I.H.'s room and sat at the edge of I.H.'s bed. Swygart grabbed I.H.'s leg and said he was sorry and that he "didn't mean to." I.H. flinched away from him, after which he "started banging his head on [I.H.'s] wall saying that he was so f'ing stupid." Swygart then left I.H.'s bedroom.

I.H.'s mother checked on I.H. in her bedroom after she returned home. When her mother entered the room, I.H. began crying. I.H. continued to cry as she told her mother that Swygart had "raped" her. I.H.'s mother responded by giving her medication to help her calm down. M.M. overheard I.H. tell their mother that Swygart had raped her.

Shortly thereafter, an argument broke out when I.H.'s mother confronted Swygart about the allegations made by I.H. At some point during this argument, a window was broken after Swygart "put his fist through it." Swygart injured his wrist in the process and had to bandage his wrist to stop it from bleeding. When I.H. awoke later that morning, I.H. noticed the injury to Swygart's wrist. I.H.'s mother also informed I.H. that she and Swygart "just wanted to keep what had happened in the family." Swygart then apologized to I.H.

Approximately one month later, Swygart began "trying to hit on" I.H., "calling her attractive and telling her that they could do it again if she wanted but her mom couldn't know." When Swygart made these comments, I.H. attempted to change the subject. She reported Swygart's comments to her mother who "seemed really mad." I.H.'s mother eventually took I.H. to I.H.'s maternal grandmother's home, telling her that I.H. "was her problem now." I.H. started crying "[b]ecause [she] knew [her] mom didn't care" about what happened to her. At some point, I.H.'s grandmother's partner informed I.H.'s biological father about what had happened. After discussing Swygart's actions with her biological father, I.H. reported Swygart's actions to the police.

Appellee–Plaintiff the State of Indiana ("the State") subsequently charged Swygart with Count I—Level 4 felony child molesting based on the incident in the bathroom, Count II—Level 4 felony sexual misconduct

with a minor based on the oral sex that occurred in I.H.'s bedroom, and Count III—Level 4 felony sexual misconduct with a minor based on the vaginal sex which occurred in I.H.'s bedroom. On February 28, 2017, Swygart proceeded to a jury trial, at the conclusion of which he was found guilty of all counts. Following a March 20, 2017, sentencing hearing, the trial court sentenced Swygart to an aggregate term of twenty-six years of incarceration, with twenty-three years executed and three years suspended to probation.

Swygart v. State, 94 N.E.3d 363 (Ind. Ct. App. 2017); ECF 5-5 at 2-6.

In the petition, Swygart asserts that he is entitled to habeas relief because the trial record lacked sufficient evidence to support his convictions and that his sentence was excessive. He further argues that trial counsel provided ineffective assistance by failing to respond properly to the jury's question as to the definition of intent and by failing to mention during closing arguments that Swygart lacked the requisite intent with respect to Count I.

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a habeas petitioner must fully and fairly present his federal claims to the state courts. *Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a hypertechnical congruence between the claims made in the federal and state courts; it merely requires that the factual and legal substance remain the same." *Anderson v. Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does, however, require "the petitioner to assert his federal claim through one complete round

of state-court review, either on direct appeal of his conviction or in post-conviction proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

Swygart presented his claims regarding insufficient evidence, excessive sentencing, and trial counsel's response to the jury question to the Indiana Court of Appeals and the Indiana Supreme Court. ECF 5-3; ECF 5-6; ECF 5-9; ECF 5-13. However, Swygart did not present his claim that trial counsel erred during closing arguments at any level. While Swygart's appellate briefs on post-conviction review reference trial counsel's closing argument, they do not suggest that trial counsel erred at closing or that the closing argument was the focus of an ineffective assistance of counsel claim. ECF 5-9 at 24-25; ECF 5-13 at 13-14. Therefore, this claim is procedurally defaulted. Swygart offers no basis to excuse the procedural default, so the court declines to further consider it.

STANDARD OF REVIEW

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

<u>DISCUSSION</u>

<u>Sufficiency of the Evidence</u>

Swygart argues that he is entitled to habeas relief because the trial record lacked sufficient evidence to support his convictions. For sufficiency of the evidence claims, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

At trial, Swygart faced the following charges:

**Count I - Child Molesting:** Between July 1, 2014, and December 1, 2014, in Adam County, State of Indiana, Michael P. Swygart, did perform fondling or touching with minor girl, a child under the age of fourteen years . . . with the intent to arouse or satisfy the sexual desires of [Swygart];

**Count II – Sexual Misconduct with a Minor:** Between June 1, 2015, and June 30, 2015, Adams County, State of Indiana, Michael P. Swygart, a person of at least twenty-one years of age did perform sexual intercourse or other sexual conduct . . . with minor girl, a child of at least fourteen years of age but less than sixteen years of age;

**Count III - Sexual Misconduct with a Minor:** Between June 1, 2015, and June 30, 2015, Adams County, State of Indiana, Michael P. Swygart, a person of at least twenty-one years of age did perform sexual intercourse or other sexual conduct . . . with minor girl, a child of at least fourteen years of age but less than sixteen years of age.

ECF 6-1 at 163-68. The jury instructions defined "sexual intercourse" as "an act that includes any penetration of the female sex organ by the male sex organ." *Id.* They defined "other sexual conduct" as "an act involving: (1) a sex organ of one person and

the mouth or anus of another person; (2) the penetration of the sex organ or anus of a person by an object." *Id.* The parties stipulated that Swygart was born in February 1975 and that the victim was born in December 2000. *Id.* at 198.

The evidence implicating Swygart primarily consisted of the victim's testimony. According to the victim, Swygart had acted as her father since she was born. ECF 6-2 at 54-60. She maintained a good relationship with him and was closer to him than her mother. *Id.* Prior to 2015, she routinely requested Swygart's presence in the bathroom when she showered due to her fear of being alone. *Id.* On most of these instances, he would converse with her as she showered and would leave when she told him she was done so that she could dress herself. *Id.* However, on one occasion when the victim, then thirteen years old, announced that she was done showering, he remained in the bathroom and informed her that he needed to see if she was still a virgin. *Id.* He lifted her on top of the washing machine, forced her legs open, spread her vagina with his hands, and examined it for a couple seconds before leaving the bathroom. *Id.* The victim told her mother, and her mother responded by forcing her to apologize to him. *Id.*

In the early hours of June 18, 2015, the victim's mother and brother left her at the house alone with Swygart. *Id.* at 60-73. She took a Klonopin pill to sleep, went to her room, and laid on her bed. *Id.* Swygart entered her room and suggested that she taken a second pill when she remained unable to sleep. *Id.* Swygart said, "Let me show you something," and rubbed her vagina outside her clothes. *Id.* He moved inside her pants and "fingered" her. *Id.* He removed her pants and underwear, kissed her, and licked her vagina. *Id.* He repositioned and partially inserted his penis in her vagina for a couple

seconds when he "realized what he was doing" and stopped. *Id.* She told her mother

when her mother came back home, and Swygart and her mother expressed their

preference to "keep it in the family." *Id.*

About a month later, Swygart told her that she was attractive and that they

"could do it again if [she] wanted but mom couldn't know." *Id.* at 75-81. The following

day, the victim told her mother about Swygart's comments, and her mother became

angry at her. *Id.* She went to her grandmother's house, crying because "[she] knew [her]

mom didn't care." *Id.* Her grandmother's boyfriend called her biological father, who

came over. *Id.* When the victim told her biological father, he took her to the police

station to submit a police report, and she moved in with her biological father. *Id.* at 51,

81-83.

The prosecution also presented Sarah Coburn, a sexual assault nurse examiner,

as an expert witness, who testified as follows:

> **Prosecution:** During your examination of a younger female, say an early
> teenager, can you examine whether, can you determine in this
> examination whether the child is a virgin or not?

> **Nurse Coburn:** No, we cannot. We actually do a lot of educating. We
> educate parents, and we also educate a lot of professionals in the medical
> field as well as law enforcement that there is no such thing as a virginity
> exam. When I have females come in, I do talk to them about whether or
> not they have menstrual periods and there's significant reason for that.
> When females go through puberty and start periods, they have estrogen
> that goes, which is a hormone, that goes to their female sex organ and that
> allows for some stretching or elasticity if you can think of it that way.
> There is no magic covering over the vaginal opening. All females are born
> with an opening. It's present there from birth to death. There are times
> that it can appear closed in a female which is just because that tissue can
> fold over on itself and what we do is, you know, we have gloves on, and
> we pull onto the outer lips and we pull up and out which will allow us to

> get that hymenal tissue to open up so that we can see the edges and we can look into the vaginal opening. We would only do a speculum exam on a female that had been through puberty and was having periods. Otherwise, it would be very painful for us to do an exam with any poking or anything like that so we've heard the term before, "popping the cherry" or, you know, that people think that there's going to be bleeding the first time that penetration takes place with either a finger or a penis and that is just not the case. Injury can happen but it is not what we would consider the norm.

*Id.* at 111-12. At the defense stage, Swygart took the witness stand and testified that, on the morning of the bedroom incident, he did not interact with the victim from the time she went to her bedroom until the time her mother came back home. *Id.* at 137-38.

On direct appeal, the Indiana Court of Appeals rejected the sufficiency of the evidence challenge to Count I, reasoning that the testimony of a child victim, by itself, is sufficient to support a child molestation conviction. ECF 5-5 at 6-9. The appellate court further reasoned that a jury could reasonably infer that Swygart forcibly examined the victim's vagina with the intent to arouse or satisfy his sexual encounters. *Id.* The Indiana Court of Appeals also rejected the sufficiency of the evidence challenges to Counts II and III, which focused on the victim's credibility. *Id.* at 9-11. The appellate court observed that, while the victim's testimony conflicted with Swygart's version of events, the testimony was consistent and that other evidence corroborated her testimony regarding reports to her mother. *Id.* It characterized the argument as no more than an invitation to reweigh the evidence. *Id.*

After reviewing the records, the court cannot find that the State court made an unreasonable determination on the sufficiency of evidence claims. The prosecution largely relied on the victim's testimony to establish that Swygart committed Counts I, II,

and III. Specifically, the victim testified that, on June 18, 2015, Swygart subjected her at age fourteen to vaginal and oral sex in her bedroom and that he forcibly examined her vagina at age thirteen in the bathroom. The critical question here on habeas review is whether any rational trier of fact could have found the essential elements of Counts I, II, and III beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319.

With respect to Count I, Swygart argues that the victim did not disavow him as a father figure after the bathroom incident and did not immediately report the incident to the police when they were contacted in July 2015 in connection with the bedroom incident. He also argues the trial evidence does not suggest that he forcibly examined her vagina with the intent to arouse or satisfy his sexual desires but that he did so with the intent of assessing whether she remained a virgin even if, as Nurse Coburn testified, his understanding of female anatomy was lacking.

Swygart similarly attacks the victim's credibility with respects to Counts II and III. He notes that her testimony conflicted with his testimony that he did not interact with her from the time she went to her room until the time her mother came back home. He further notes that the victim testified that Swygart called her mother immediately after the bathroom incident, but, at trial, the parties stipulated that no such call had occurred. He notes that the victim mentioned briefly thinking that the bathroom incident was a dream and falsely reported that a family friend was present later that morning. He notes that the victim testified that she had taken Klonopin, which may have affected her memory, and also testified Swygart caused her pain when he licked her vagina. After reporting the bathroom incident to her mother, the victim did not

raise any concerns until the following month. Swygart argues that the victim was also motivated to fabricate the accusation because she spent most of her free time on the internet and the Swygart household had recently discontinued their internet service. According to Swygart, the victim accused him of sexual misconduct in order to leave Swygart and to move to a location more likely to have internet service.

Significantly, a victim's testimony, by itself, is sufficient to support a conviction of sexual assault. *Ali v. Baenen*, 2013 WL 4591980, at *4 (W.D. Wis. 2013) (collecting federal cases); *Deaton v. State*, 999 N.E.2d 452, 456 (Ind. App. 2013) (collecting Indiana cases). Further, at this stage of the proceedings, the court is required to view the evidence in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319, 326. As Swygart notes, the trial record revealed some concerns regarding the victim's credibility, but these concerns are not so significant as to prevent a rational jury from crediting the victim's material testimony about the bathroom incident and the bedroom incident.

For example, the victim testified that she believed the family friend was present on the morning of the bedroom incident based on a later conversation with the family friend rather than her personal observation. ECF 6-2 at 88. She also testified that she merely assumed that Swygart called her mother after the bedroom incident because her mother returned shortly thereafter. *Id.* 68-69. She explained that she did not see him dial a particular number and only overheard cuss words. *Id.* These explanations are reasonably plausible, and a rational jury might have credited them. Further, the jury may have reasonably inferred that the victim did not appreciate the potentially criminal

12

nature of the bathroom incident until sometime after she had reported the bedroom incident to the police. Swygart provided an innocuous explanation to a thirteen-year-old who viewed him as her father, and, at that time, she may have had no apparent reason to question it. Additionally, the record suggests that she promptly reported these incidents to her mother and that she elevated them to her biological father and the police when Swygart continued to pursue a sexual relationship with her and when she lost confidence that her mother would help her. In other words, the record contained ample basis for a rational jury to credit the victim's material testimony regarding the bedroom and bathroom incidents notwithstanding some credibility concerns.

The trial record also contained sufficient evidence that Swygart forcibly examined her vagina with the intent to arouse or satisfy his sexual desires. Though Swygart told the victim that he merely wanted to assess whether she remained a virgin, it would not be irrational for a jury to infer a sexual motive. It is not irrational to assume that an individual intended to arouse his sexual desires by touching and looking at another person's genitalia, particularly when other evidence indicates that that individual subsequently pursued a sexual relationship with the other person. Therefore, the sufficiency of the evidence claim is not a basis for habeas relief.

### Ineffective Assistance of Trial Counsel

Swygart argues that trial counsel provided ineffective assistance by failing to respond properly to the jury's question as to the definition of intent. He maintains that, in response to the jury's question during deliberations, trial counsel should have insisted that the trial court reread the jury instructions in their entirety rather than

rereading only the intent instruction. For this claim, he relies on language from *Ramirez v. State*, 174 N.E.3d 181, 198 (Ind. 2021), in which the Indiana Supreme Court stated, "When giving a supplemental instruction, the trial court must reread the entire set of final instructions in the presence of the jury and parties." Swygart further maintains that trial counsel should have insisted that the trial court direct the jury to reread the intent instruction rather than squarely answering the jury's question regarding intent.

With respect to prejudice, Swygart observes a discrepancy between the Count I jury instruction and trial counsel's closing argument. He maintains that the trial court properly instructed the jury to consider whether Swygart acted with the intent to arouse his sexual desires or the intent to satisfy his sexual desires but, at closing, trial counsel argued only that the evidence did not demonstrate that Swygart acted with the intent to satisfy his sexual desires. He asserts that the trial court's response overemphasized the element of intent and encouraged the jury to find him guilty on different factual bases.

To prevail on an ineffective assistance of counsel claim in the State courts, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

As detailed above, the prosecution primarily relied on the victim's testimony to establish the factual basis for Count I. In opening statements and closing arguments, the prosecution specifically indicated that the evidence demonstrated that Swygart intended "to arouse or satisfy" his own sexual desires during the bathroom incident. ECF 6-1 at 181; ECF 6-2 at 155-56. By contrast, trial counsel argued only that the evidence did not demonstrate that Swygart intended "to satisfy" his sexual desires during the bathroom incident. *Id.* at 166.

Final Instruction No. 6 pertained to Count I and read as follows:

The Crime Definition. The crime of child molesting is defined by statute as follows:

A person who, with a child under fourteen years of age, performs or submits to any fondling or touching of either the child or the

15

older person with intent to arouse or to satisfy the sexual desires of either the child or the older person commits child molesting, a Level 4 felony.

Before you may convict the defendant, the State must have proved each of the following beyond a reasonable doubt:

1) the defendant;

2) with the intent to arouse or satisfy the sexual desires of minor girl or Michael P. Swygart;

3) when minor girl was a child under fourteen years of age;

4) knowingly;

5) performed fondling or touching of minor girl.

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the defendant not guilty of child molesting, a Level 4 felony charged in Count I.

ECF 6-2 at 174-75.

During jury deliberations, the jury submitted a question to the trial court.

Following an off-the-record conference with the parties, the trial court ruled as follows:

**Trial Court:** The jury had a question regarding final instruction number six. Their question was, please give legal definition of intent, number one, and then two, does the word intent in instruction number six, number two, go with both the intent to arouse and/or the intent to satisfy sexual desires, and so after conferring with the parties, we have agreed to what I'm going to read to the jury to try and help them with their question and what I'm going to read to them says intent means to have in mind a fixed purpose to reach a desired objective and then the next part says the intent referenced on instruction six, part two, is the intent to arouse or satisfy the sexual desires and so that is going to be what I'm going to read to the jury. Is that satisfactory to the prosecutor?

**Prosecution:** Yes, your honor.

**Trial Court:** And defense?

16

**Trial Counsel:** Yes, your honor.

**Trial Court:** Okay, very good. You can bring them in.

\* \* \*

**Trial Court:** When you had a question with the court, you asked it in written form. Sandy notified me through Vickie, court administrator, that you had a question so when I have a question like that, I vetted it with both attorneys and so I hope that this helps you in your endeavor. So pay close attention. Intent means to have in mind a fixed purpose to reach a desired objective and then the next part says the intent referenced on instruction six, part two, is the intent to arouse or satisfy the sexual desires. It's an "or" not an "and." Okay. The attorneys satisfied?

**Prosecution:** Yes, your honor.

**Trial Court:** Okay, very good. I would ask that you return to deliberate with that additional help.

*Id.* at 186-89.

At the post-conviction stage, trial counsel submitted an affidavit, attesting as

follows:

9. During deliberations, the jury asked for a definition of intent and asked whether intent went to both alternatives of the crime: to arouse and to satisfy sexual desires.

10. The Judge and Prosecutor and I met in the Judge's chamber to decide how to answer the jury's question.

11. I agreed that Judge should respond to the jury's question by defining intent and that intent applied to either clause.

12. The Judge called in the jury and read the answer to the jury.

13. I saw the jury's question as a positive sign that the jury was questioning Swygart's intent to commit Child Molesting in Count I.

14. I did not ask the Judge to reread all the instructions with the additional instruction added in.

ECF 6-7.

The Indiana Court of Appeals rejected this claim, observing that the *Ramirez* language quoted by Swygart was dicta rather than binding authority. ECF 5-12. The appellate court found no deficient performance, reasoning that, even if *Ramirez* amounted to binding authority, trial counsel made a strategic decision in agreeing to the trial court's response to the jury question based on trial counsel's attestation that he saw the emphasis on the intent element for Count I as beneficial for Swygart. *Id.* The appellate court further found that Swygart did not demonstrate prejudice because the testimony regarding his subsequent actions provided strong evidence of sexual intent. *Id.*

After reviewing the record, the court cannot find that the State court made an unreasonable determination on the ineffective assistance of counsel claim. At closing, trial counsel argued that the timing of the victim's disclosure of the bathroom incident suggested that it did not occur and that, even if it did occur, Swygart acted with the misguided fatherly intent of checking his daughter's virginity. In other words, part of trial counsel's strategy with respect to Count I was to persuade the jury that the prosecution had not satisfied its burden of proof for the intent element. He did not make this argument with respect to Counts II and III. Considering the lack of specific knowledge about what occurred during deliberations, trial counsel reasonably inferred that the jury's question regarding intent indicated that the jury found this argument to

be persuasive to some degree. It was thus not unreasonable for trial counsel to approve the supplemental instruction and its manner of delivery, which served to emphasize this defense argument.

Swygart further argues that the trial court properly instructed the jury to consider whether he acted with the intent to arouse or satisfy his sexual desires but, at closing, trial counsel argued only that the evidence did not demonstrate that Swygart acted with the intent to satisfy his sexual desires. He maintains that the supplemental instruction overemphasized the element of intent and encouraged the jury to find him guilty on different factual bases.

The court first observes that, at closing, the prosecution argued that Swygart acted with both the intent to arouse his sexual desires and the intent to satisfy his sexual desires. The final jury instructions similarly included these intent options. Thus the underlying premise of Swygart's argument is that, at closing, trial counsel persuaded the jury to neglect the "intent to arouse" language in the instruction but allowed the jury to be reminded of this language through the supplemental instruction. Review of the closing argument suggests that trial counsel essentially conflated "intent to arouse" with "intent to satisfy" and meant to argue more broadly that the prosecution had not proven a sexual motive rather than employing a slight-of-hand maneuver to confuse the jury. It also seems unlikely that such a maneuver would have been successful given the express references to the "intent to arouse" language in the prosecution's closing argument and the final jury instructions, copies of which were in the jury's possession during deliberations. In any event, the trial court provided the supplemental instruction

19

in direct response to the jury question on the intent language, and the jury question strongly indicates that the jury's attention was already focused on this language. Consequently, it is unclear how the supplemental instruction could have substantially increased the likelihood of conviction.

Additionally, the proposed strategies of insisting that the trial court reread and redirect the jury's attention to the final jury instructions may have made a conviction even more likely. The final instructions invited the jury to find that Swygart acted "with the intent to arouse or satisfy the sexual desires of minor girl or Michael P. Swygart." In other words, the final instructions offered four intent options to the jury: (1) the intent to arouse the sexual desires of Swygart; (2) the intent to satisfy the sexual desires of Swygart; (3) the intent to arouse the sexual desires of the victim; and (4) the intent to satisfy the sexual desires of the victim. Consequently, under Swygart's logic, redirecting the jury's attention to the final jury instructions would have emphasized two additional intent theories and so would have been even more likely to result in a conviction. Because the court cannot find that the State court made an unreasonable determination on this claim, it is not a basis for habeas relief.

<u>Excessive Sentence</u>

Swygart argues that he is entitled to habeas relief because the trial court ordered him to consecutively serve the sentences for Counts II and III and also sentenced him to the maximum permissible sentence for each count. He maintains that his sentence is inappropriate because he is "not the worst of the worst."

"A federal court will not normally review a state sentencing determination [that] falls within the statutory limit." *Koo v. McBride*, 124 F.3d 869, 875 (7th Cir. 1997). "However, we shall review a petitioner's showing that the sentencing court lacked jurisdiction to impose this term or committed a constitutional error making the sentence fundamentally unfair." *Id.* A sentence violates the Constitution if it is extreme and grossly disproportionate to the crime." *Id.* There are "three factors relevant to the proportionality determination: (1) the inherent gravity of the offense, (2) the sentences imposed for similarly grave offenses in the same jurisdiction, and (3) sentences imposed for the same crime in other jurisdictions." *Id.* at 875-76.

Under Indiana law, "a person who commits a Level 4 felony shall be imprisoned for a fixed term of between two and twelve years with the advisory sentence being six years." Ind. Code § 35-50-2-5.5. "A person who commits a Level 3 felony (for a crime committed after June 30, 2014) shall be imprisoned for a fixed term of between three (3) and sixteen (16) years, with the advisory sentence being nine (9) years." Ind. Code § 35-50-2-5. "[E]xcept for crimes of violence, the total of the consecutive terms of imprisonment . . . to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the advisory sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted." Ind. Code § 35-50-1-2(c) (2014).

The jury convicted Swygart of three Level 4 felonies. At the post-conviction stage, the State conceded that Ind. Code § 35-50-1-2(c) applied to Counts II and III and agreed to modify his sentence. Following this modification, Swygart received

consecutive sentences of twelve years of incarceration for Count I and four and a half years for Count II, and four and a half years for Count III. This sentence falls within the State statutory limits. Though Swygart suggests that his sentence may be excessive and grossly disproportionate, he makes no argument regarding the severity of his crimes and provides no examples of lesser sentences imposed on individuals who have committed similar crimes. Because Swygart has not demonstrated that his sentence violates his constitutional rights, this claim is not a basis for habeas relief.

CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Swygart to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

22

SO ORDERED on June 14, 2023.

s/Holly A. Brady
_____
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT